UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GENEVA E. BRANCH,                      )
                                       )
            Plaintiff,                 )
                                       )
      vs.                              )        Case No. 4:14-CV-1188 (CEJ)
                                       )
CAROLYN W. COLVIN, Acting              )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.  Procedural History

On May 19, 2011, plaintiff Geneva A. Branch filed an application for disability insurance benefits, Title II, 42 U.S.C. § 401 *et seq.*, with an alleged onset date of August 13, 2010.  (Tr. 128-29).  After plaintiff's application was denied on initial consideration (Tr. 76-82), she requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 83-84).

Plaintiff and counsel appeared for a hearing on August 1, 2012.  (Tr. 27-57).  The ALJ issued a decision denying plaintiff's application on January 22, 2013.  (Tr. 8-20).  The Appeals Council denied plaintiff's request for review on May 1, 2014.  (Tr. 1-6).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.[1]

## II.  Evidence Before the ALJ

## A.  Disability Application Documents

In the Disability Report completed by plaintiff's representative, Melissa Smith, on June 15, 2011, plaintiff's medical conditions were reported to be migraines, sleeping problems, insomnia, a hole in the heart (patent foramen ovale), thyroid problems,

---

[1] Plaintiff died on July 17, 2014, after the filing of this action.  Thereafter, her husband, Dennis Branch, was substituted as the plaintiff to the action by motion.  See Mot. & Order [Doc. ##12-13].

cholesterol, and asthma. (Tr. 142-52). Plaintiff was 5'4'' and weighed 160 pounds. She was taking medication for migraines, depression, her thyroid, reflux, cholesterol, and to aid her sleep.

In the Function Report completed on June 21, 2011 (Tr. 153-63), plaintiff wrote that her daily activities consisted of going to the living room and either sitting or lying down on the couch, if she could get out of bed. In the past, plaintiff had taken care of the pets at home, but her husband had since taken over the majority of required care. Before the onset of her medical problems, plaintiff used to drive to Kentucky to see relatives at least once a month and used to watch her grandchildren often. Plaintiff's head pain affected her sleep by either waking her up or preventing her from falling asleep. With regard to her personal care, plaintiff wrote that her husband sometimes had to help her dress and bathe. She reported that she had fallen off the toilet. Plaintiff did not cook or prepare meals. Most of the time, plaintiff was not hungry because she felt sick. She did not drive because she feared she "might kill someone." (Tr. 154). Her husband had to remind her to take her medicine.

Plaintiff wrote that she changed the cat's litter box twice a month and tried to help with laundry once every other month. Her husband asked her to help around the house more, but plaintiff stated that "the more I move around the worse my head hurts." (Tr. 155). Plaintiff would go outside once a week if it was warm. However, since she started falling down and losing her vision, her husband did not want her to go outside alone. Plaintiff shopped for groceries once a month, but after a shopping trip she "can't do anything for 2 or 3 days." (Tr. 156). She was capable of handling finances at home, but needed to be reminded to pay the bills.

Plaintiff's hobbies and interests included reading, watching television, working on cross-stitch, and playing with her grandchildren. Every time she tried to engage in social activities, however, plaintiff reported that she "hurt more" and the pain caused her to "either leave early or have to be guided out." (Tr. 158). Plaintiff noted that her health

conditions affected her ability to walk, talk, see, remember, complete tasks, concentrate, understand, and follow instructions. Specifically, plaintiff wrote that her "equilibrium is off," which caused her to bump into walls or fall down; her speech became impaired and she could not remember words; she struggled "to try to make someone understand what I want to say;" her vision was either "fuzzy or like a kaleidoscope" and she sometimes lost complete vision in her right eye; it sometimes felt "like people aren't speaking the same language" as she was; and her ability to concentrate was interrupted by pain. (Tr. 158, 160). The farthest she could walk before needing a rest was from the bedroom to the couch or the couch to the kitchen. Plaintiff got along "very well" with authority figures, had never been fired from a job, and could handle changes in routine. (Tr. 159).

Plaintiff's Work History Report shows that she was employed as a title specialist at GE Capital Mortgage from January 1996 to December 1999, and then as a service specialist in accounts and transfers at Edward Jones from April 2000 to August 2010. (Tr. 164-67). At Edward Jones she worked up to nine hours a day, sitting the entire time and using a computer and a phone. At GE she also sat for eight hours a day, except when she moved files on a cart.

In the Disability Report filed for plaintiff's appeal (Tr. 169-74), plaintiff's representative wrote that plaintiff continued to have severe migraines and described her pain as debilitating. Plaintiff reported losing her vision at times when the pain was acute. Also, plaintiff normally had to stay in bed for an extended period of time.

### B.  Testimony at the Hearing

Plaintiff was 51 years old on the date of the hearing. (Tr. 32). She was 5'4'' and weighed 250 pounds. Plaintiff stated that her significant weight gain in the past year was caused by her inability to be active. She reported that she was unable to drive because of the impact her migraines sometimes had on her vision. (Tr. 33). Plaintiff had her GED and had completed two years at a business college, but she did not receive a degree or

certificate. She also had completed computer classes as an adult to maintain her work level. (Tr. 34).

Plaintiff testified that she had last worked on August 13, 2010 as an accounts and transfer specialist for Edward Jones. She performed this job sitting down, talking on the phone, and using a computer 95 percent of the time. She never lifted more than five pounds at a time. Plaintiff worked at Edward Jones for over ten years and left because she could not drive or perform her job properly. She experienced migraines that were triggered by flashes of light or noise with a severity ranging "from a four to a ten." (Tr. 35). When the migraines happened, she would call in sick or arrange for her daughter to pick her up from work and ask permission to leave early. Before Edward Jones, plaintiff worked as a title specialist at GE Capital Mortgage for ten years, researching titles on a computer and by phone. (Tr. 36-38). The job involved some loading or pushing stacks of files on a cart and lifting a maximum of 10-15 pounds.

At the time of the hearing, plaintiff had been receiving pain medication and treatment for her migraines at a clinic in Chicago for more than a year. (Tr. 40-42). She reported that the treatment she received had helped, since previously she could not stand any noise, light, or being around others, and remained "curled up in a ball" on her bed. (Tr. 42). The medications she currently took made the pain more tolerable, but she stated that her migraines were still at "a level 10" two to three times a week and were "never lower than 4." (Tr. 42). Plaintiff also reported that she saw a psychiatrist to help with her inability to sleep caused by the pain. She stated that she was on her "third day today of not being able to sleep." (Tr. 43). When her medication worked, she slept for 12 hours straight. She also saw a medical provider for her asthma, thyroid, and cholesterol.

On a typical day, plaintiff reported that she didn't do "much of anything." (Tr. 44). She stated that her "own footsteps bang through [her] head," so she did not move around much. Because of her inability to move, she no longer paid the bills, did laundry, or feed the pets. She also did not read, cross-stitch, or etch glass like she used to, because

concentrating for long periods caused her migraines to increase. (Tr. 45). Plaintiff could sit for only 30 minutes at a time before her pain increased. When taking showers, she needed to sit down at least twice before she could finish bathing, and she sometimes had trouble getting out of the tub. (Tr. 46). At least twice a week she didn't get out of bed because of the severity of her migraines. Her husband handled most of their shopping.

Plaintiff reported feeling nauseous 2 to 3 times a day. To alleviate or manage her migraines, plaintiff had to "get away from everyone," turn off the lights, television, and radio, and lie down. (Tr. 47). Before she began taking medication for her migraines, plaintiff stated that she was not coherent and her words "would get all twisted up." (Tr. 48). She stated that she had tried everything she could think of to alleviate the migraines so that she could work because she loved her job. "Just about everything" made her pain worse now. (Tr. 49). Plaintiff's attorney asked her if she would be able to work at a low-stress job without extensive mental demands where she could take breaks in the morning, at lunch, and in the afternoon, get up and move around during the day if she needed, and miss one day a month from work. Plaintiff responded that there was "no way I would be able to do that," because her migraine was constant, ranging from a "level of 4 to 10 and above." (Tr. 50).

Delores Gonzalez, a vocational rehabilitation counselor, provided expert testimony regarding the employment opportunities for an individual of plaintiff's age, education and work experience. (Tr. 52). Gonzalez classified plaintiff's past work as a "transfer clerk, accounts representative" as light, semi-skilled work, but sedentary as performed by plaintiff, and the position of a title specialist as light, semi-skilled work, but again sedentary as performed by plaintiff. (Tr. 54). The ALJ posed a first hypothetical to the vocational expert of a person capable of performing at the light exertional level, limited in that he or she is unable to operate a motor vehicle, can only have occasional exposure to hazards such as unprotected heights and moving mechanical parts, and is limited to performing simple, repetitive tasks. The vocational expert testified that such a person would not be able to

perform any of plaintiff's past relevant work, but could perform work as an order caller or mail sorter.

In a second hypothetical, the ALJ asked Gonzalez to assume all of the limitations from the first hypothetical and then also assume that the person would need to leave work approximately two hours early twice a week due to a medical issue. (Tr. 55). Gonzalez testified that such a person would not to be able to perform the jobs as an order caller or mail sorter, and also would not be able to perform any other work in the regional or national economy.

Plaintiff's attorney then asked the vocational expert to consider the description of the first hypothetical individual and add a limitation that the individual would miss two whole days or more a month. Gonzalez testified that such a person would not be able to work competitively, particularly during the probationary period of a new job. Upon inquiry as to whether an individual who, due to pain and difficulty concentrating, was off-task a minimum of 20 percent of the day could perform competitive employment, the vocational expert responded that a person needs to be on task for two hour periods before taking short breaks. (Tr. 56).

## C.  Medical Records

Plaintiff was first evaluated for headaches on June 12, 2009 at Metropolitan Neurology, Ltd. by Richard A. Head, M.D. (Tr. 212-13). She reported 1-2 migraines a week with some nausea. She stated she would see spots at times, particularly in her right eye. The headaches had started in her teenage years. Maxalt[2] had not helped. Relpax[3] had helped some, but did not stop the headaches. When her headaches worsened, she used Tylenol and ice packs. Her headaches were worse during storms and with increased stress.

---

[2] Maxalt, the brand name for Rizatriptan, is a selective serotonin receptor agonist used to treat the symptoms of migraine headaches.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601109.html (last visited June 30, 2015).
[3] Relpax, the brand name for Eletriptan, is also a selective serotonin receptor agonist used to treat the symptoms of migraine headaches.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603029.html (last visited June 30, 2015).

She reported having a scan of her head a few years ago that was normal. Her family history indicated that her mother also had had migraines. Upon physical examination, Dr. Head noted that plaintiff was overweight for her height, and her speech was fluent and appropriate. Cranial nerve testing showed her visual fields to be full. Sensory testing was normal. Dr. Head opined that plaintiff appeared to be having common migraines and instructed her to avoid caffeine as much as possible. He also suggested plaintiff take Topamax[4] at bedtime and provided her a prescription for Imitrex.[5] Plaintiff called Dr. Head on August 3, 2009 and reported that her headaches were unchanged on Topamax, and she did not feel that the Imitrex was working as desired. (Tr. 211). Dr. Head instructed plaintiff to increase her use of Topamax, and if that failed, he would try something different when saw her for a follow-up appointment.

Plaintiff again saw Dr. Head for a follow-up evaluation for her migraines on September 4, 2009. (Tr. 209-10). Dr. Head noted that plaintiff was doing very well on the increased dosage of Topamax. She occasionally had a headache but responded to Imitrex. Dr. Head considered plaintiff's migraines well-controlled at this time. He planned to continue her current medications and asked her to return for a follow-up in one year. When plaintiff returned to Dr. Head on August 5, 2010 (Tr. 205-06), she stated that she was having 1-2 headaches a week, lasting two days at a time. She also was not sleeping well, had had some episodes of decreased right eye vision, difficulty understanding speech, and numbness. The doctor noted that he had not been contacted about these episodes, but they apparently had been bothering her for several months. Plaintiff was taking 2-3 Tylenol tablets several times a day. She also reported drinking about eight cups of coffee a day. Dr. Head discussed plaintiff's caffeine intake and told her she would not be able to get her

---

[4] Topiramate, brand name Topamax, is an anticonvulsant that is used to prevent migraine headaches but not to relieve the pain of migraines when they occur.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697012.html (last visited on Jan. 13, 2015).
[5] Imitrix, the brand name for Sumatriptan, is an additional selective serotonin receptor agonist used to treat the symptoms of migraines that stops pain signals but does not reduce the number of headaches. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601116.html (last visited June 30, 2015).

headaches under control unless she stopped. Dr. Head also thought plaintiff might be rebounding from the excessive amount of Tylenol she was taking. The doctor planned to start plaintiff on Depakote[6] and instructed her to follow-up in a month.

On August 12, 2010, plaintiff was admitted to the emergency department at St. Anthony's Medical Center. (Tr. 281-88). She complained of a headache for four days and nausea. She described the pain as throbbing, constant, and unrelieved despite use of Tylenol. Her physical exam and urine test were normal. She was given Benadryl, Toradol,[7] Reglan,[8] and normal saline by IV. Three hours after being admitted, she was discharged in improved condition.

During a follow-up appointment on August 17, 2010, plaintiff told Dr. Head that she had been caffeine-free since her last appointment, except for two drinks. (Tr. 214). She stated that she nonetheless had had headaches almost every day and had missed a lot of work. The doctor noted that plaintiff had not improved as well as he expected. However, plaintiff looked fine that day and stated she had been sleeping. She complained of intermittent sharp pains in the left temporal area around her eyes or in the back of her head. On examination, plaintiff's eye grounds were normal and her visual fields were full. The doctor recommended blood tests and encouraged plaintiff to abstain from caffeine. An MRI conducted that same day at St. Anthony's Medical Center was normal. (Tr. 207-08, 280, 353).

On August 23, 2010, plaintiff had a telephone conversation with Dr. Head during which she reported that she still had constant headaches and was not sleeping at night. Dr. Head explained to her that the MRI of her brain and her blood tests were normal. Plaintiff was crying on the phone and stated that her headaches were ongoing day and night. She

[6] Depakote, or Valproic acid, is also used to treat mania in people with bipolar disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).
[7] Ketorolac tromethamine, or Toradol, is "a nonsteroidal antiinflammatory drug administered intramuscularly, intravenously, or orally for short-term management of pain[.]" See Dorland's Illustrated Med. Dict. 1966, 998 (31st ed. 2007).
[8] Reglan is used to relieve nausea by speeding the movement of food through the stomach and intestines. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601158.html (last visited June 30, 2015).

felt there had to be something physically wrong.  With her normal exam results, Dr. Head told her he strongly felt there was a stress component involved.  Plaintiff and her husband denied any stress.  The only further test Dr. Head told her he could recommend was a spinal tap to look for chronic infection, bleed, or increased pressure.  He scheduled her for the procedure.  (Tr. 215).

Plaintiff sought treatment at the emergency department of Barnes-Jewish Hospital on September 4, 2010.  (Tr. 229-60).  She complained of constant migraine headaches for three months, which consisted of piercing pain radiating around her entire head.  She stated that she had tried multiple medications and been to multiple emergency rooms in an attempt to obtain relief, but had found none so far.  An IV was initiated and plaintiff was medicated with normal saline for hydration, Ketorolac[7] for pain, and Prochlorperazine[9] for her headache.  About an hour later, plaintiff stated that the pressure was much better, but she continued to have sharp, stabbing pains.  She was then given Diphenhydramine[10] as a prophylaxis and Droperidol[11] for pain.  An hour later, plaintiff verbalized increased relief from medication.

In a neurological consult at Barnes-Jewish Hospital, plaintiff stated that her previous migraines before June were much more sporadic and she used over-the-counter medication, ice and rest to treat them.  Her recent headaches since June started building up and "just did not go away."  The frequency of the headaches had increased from once every few months to a few times every week to daily headaches for the past 4-6 weeks.  Her headache was throbbing now with associated symptoms of nausea, photophobia, phonophobia, photopsia, and blurry vision worsening with movement of her head.  Thunderstorms and weather changes made her headache worse.  She reported drinking two

[9] Prochlorperazine, also known as Compazine, is used to control severe nausea and vomiting and to treat the symptoms of schizophrenia and anxiety.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682116.html (last visited on Sept. 1, 2011).
[10] Diphenhydramine is used to relieve symptoms caused by hay fever, allergies, or the common cold.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682539.html (last visited July 1, 2015).
[11] Droperidol is an antiemetic used to lessen or stop migraine pain.
http://effectivehealthcare.ahrq.gov/search-for-guides-reviews-and-reports/?pageaction=displayproduct&productID=1716 (last visited July 1, 2015).

cups of coffee a day.  Although she tried stopping coffee for two weeks, she experienced no benefit.  She occasionally drank tea.  The medical care provider noted that plaintiff could have poor hydration.  Plaintiff reported that the intensity of her headache had decreased a great deal with the medications she received in the emergency room.  Following blood tests, chest x-rays, a CT scan, an EKG, and a normal examination, the treating physician recommended she be discharged.  Plaintiff was diagnosed with a recurrent migraine headache and instructed to follow-up with the neurology clinic in the following week.

In a letter dated September 13, 2010, Dr. Head wrote that plaintiff had called and canceled the spinal tap that he scheduled.  (Tr. 216).  Plaintiff and her husband then requested that her records be transferred to another physician and they insisted that Dr. Head fill out FMLA paperwork for plaintiff.  Plaintiff's records were transferred, but Dr. Head's secretary told plaintiff that the doctor would not complete FMLA paperwork for her if she refused to follow-up with the test he had recommended or return to his office.

An echocardiogram of plaintiff's heart from October 8, 2010 found a right to left atrial shunt, and she was referred to James M. Perschbacher, M.D. at Metro Heart Group of St. Louis, Inc.  (Tr. 262-63, 266-67).  Dr. Perschbacher determined that plaintiff's abnormal echocardiogram most likely pointed to a patent foramen ovale[12] (PFO), which he noted is present in up to 25% of the population.  Plaintiff and her husband stated that they were "desperate" for a fix for plaintiff's migraine headaches and hoped that closure of her PFO might be that fix.  Dr. Perschbacher informed plaintiff that he thought it unlikely he would be able to offer her closure, since his medical clinic did "not participate in any of the migraine PFO closure studies."  A transesophageal echocardiogram on October 25, 2010 at St. Anthony's Medical Center confirmed a PFO at her atrial septum.  (Tr. 272-73).

---

[12] A patent foramen ovale is a hole between the left and right upper chambers of the heart, which exists in everyone before birth, but sometimes fails to close naturally.  The condition is not treated unless there are other problems.  http://www.nlm.nih.gov/medlineplus/ency/article/001113.htm (last visited July 1, 2015).

At an appointment with Neera Sharda, M.D. on December 9, 2010, plaintiff reported that she continued to have chronic, persistent, daily headaches. (Tr. 331-32). All neurological tests thus far remained negative. She had been referred to psychiatry for possible depression. Dr. Sharda diagnosed plaintiff with unspecified acquired hypothyroidism, hyperlipidemia, migraine, esophageal reflux, allergic rhinitis, and extrinsic asthma, and instructed plaintiff to continue with her current medication regimen.

At her first appointment with a psychiatrist, Gautam Rohatgi, D.O. at Comtrea on January 31, 2011, plaintiff reported that her neurologist believed her migraines were caused by depression. (Tr. 420-22). She reported a history of migraines since childhood. Numerous blood work studies as well as an MRI and EEG since August 2010 had all been negative. Plaintiff denied depression or loss of interest, although she stated she experienced frustration, irritability, and the feeling of being overwhelmed given the migraines. Plaintiff reported feeling claustrophobic in the interview and stated that in the past, Prozac had been of benefit. She did not have a history of going to therapy. Her daily activities depended upon her headaches and the strength of those headaches. Dr. Rohatgi noted that during their conversation, plaintiff's hands were gripping her forehead as if she was in mild distress. Her speech was fluent and clear, her thought process was linear, and her grooming and hygiene were appropriate. Both her mood and affect were frustrated. Dr. Rohatgi diagnosed plaintiff with claustrophobia and assigned her a Global Assessment of Functioning (GAF) score of 60.[13] He started plaintiff on Citalopram[14] and suggested a follow-up examination in four weeks.

At her next appointment with Dr. Rohatgi on February 28, 2011, plaintiff reported that the Citalopram helped decrease her anxiety. (Tr. 418-19, 471-72). She also stated

---

[13] A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[14] Celexa, or Citalopram, is prescribed to treat depression.
www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

that she had been taking her friend's Trazodone,[15] which she found helped her sleep.  Her main symptoms, she reported, were her headaches, and all of her issues revolved around the headaches.  Dr. Rohatgi increased plaintiff's dosage of Citalopram, prescribed Trazodone, and advised she discontinue use of Amitriptyline[16] and Benadryl.  At her follow-up appointment with Dr. Rohatgi on April 4, 2011, plaintiff reported no change in her mood or anxiety and her sleep had improved to 6-8 hours of undisturbed sleep per night.  (Tr. 416-17, 469-70).  She had experienced no increase in headaches, but no decrease either.  Her mental status examination was normal, and Dr. Rohatgi again increased her dosage of Citalopram.

At her appointment with Dr. Rohatgi on May 2, 2011, plaintiff stated that if her headaches went away, she would feel significantly improved in her function and outlook.  (Tr. 414-15, 467-68).  Plaintiff expressed frustration, irritability, agitation, sadness, fatigue, and loss of function due to the headaches.  Her husband stated that he believed plaintiff was mildly depressed, but that it was due to the pain and headaches.  Dr. Rohatgi diagnosed plaintiff with claustrophobia and depression not otherwise specified.  He continued her on Citalopram, discontinued Trazodone, and added a small dosage of Ambien[17] for her insomnia.  At her follow-up appointment with Dr. Rohatgi on May 31, 2011, plaintiff reported that Dalmane[18] had helped her stay asleep for eight hours, which she had not experienced before.  (Tr. 412-13, 465-66).  She also reported continual headaches and felt that all doctors had "washed their hands of her."  She had not yet followed through on recommendations to visit a headache clinic.  Dr. Rohatgi's mental status examination noted that she was sitting in her chair in very mild discomfort, and her

---

[15] Trazodone is a seratonin modulator prescribed for the treatment of depression.  It may also be prescribed for the treatment of schizophrenia and anxiety.
www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[16] Amitriptyline is a tricyclic antidepressant, sometimes used to treat eating disorders and post-herpetic neuralgia.  http://www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Mar. 23, 2009).

[17] Ambien is used for the short-term treatment of insomnia.  See Phys. Desk Ref. 2867-68 (60th ed. 2006).

[18] Dalmane, the brand name for Flurazepam, is a benzodiazepine used to treat insomnia short-term.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682051.html (last visited July 1, 2015).

affect and mood were irritable. The doctor continued her with Citalopram, discontinued the Dalmane, and added Triazolam[19] to her regimen. He also again referred to her a headache clinic.

At her next appointment with Dr. Rohatgi at Comtrea on July 5, 2011, plaintiff stated that she was scheduled for a visit at the Diamond Headache Clinic the following week. (Tr. 410-11, 463-64). She reported that she had been taking Triazolam and Dalmane to fall asleep, and the doctor discussed with her how this was not his suggested medication regimen. Dr. Rohatgi noted that plaintiff was cooperative, sitting in her chair smiling, had fluent speech, appropriate affect, and was in a good mood. He again instructed her to discontinue Dalmane.

Plaintiff went to the Diamond Headache Clinic, Ltd. in Chicago for a week-long evaluation under the care of Alex Feoktistov, M.D. on July 13, 2011. (Tr. 375-83, 442-50). During the intake evaluation, she reported being under "extreme stress" related to finances and sexuality. She smoked less than half a pack of cigarettes a day, consumed two caffeine drinks per day, and socially used alcohol. She complained of headaches every day and reported visual auras that lasted up to two hours. She noted that while other medications had not helped, Ketorolac had helped. Plaintiff complained of poor sleep quality, frequent nighttime awakenings, vision loss earache, nosebleeds, sensitivity to smells, difficulty breathing at night, skipping heart beats, fatigue, lightheadedness, shortness of breath, coughing up blood and phlegm, chest discomfort, excessive snoring, loss of appetite, nausea, bone pain, joint pain, dry skin, excessive perspiration, difficulty with concentration, poor balance, inability to speak, vertigo, anxiety, cold intolerance, excessive thirst, lack of sexual drive, and seasonal allergies. Her physical and mental examinations were normal.

Because outpatient treatment methods had been ineffective, Dr. Feoktistov admitted her to the in-patient unit at the Diamond Headache Clinic for IV treatment. She was

---

[19] Triazolam is a benzodiazepine used on a short-term basis to treat insomnia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684004.html (last visited July 1, 2015).

administered Toradol[7] to alternate with Norflex,[20] Benadryl, Zofran,[21] Levothyroxine,[22] Protonix,[23] Simvastatin,[24] Lyrica,[25] Dolophine[26] with Phenergan,[27] and Depo-Medrol.[28]  She was instructed to keep a headache calendar, follow a low tyramine diet, decrease caffeine intake, lose weight, keep regular sleep habits, and keep her blood pressure low.  Plaintiff was discharged on July 20, 2011 in stable condition.  (Tr. 452-54).  Her general chemistry, toxicology, hematology, urinalysis, and EKG tests had all came back negative or within normal limits.  George Nissan, D.O. noted that during her hospitalization, plaintiff's acute pain was managed mainly with simple non-narcotic analgesics.  Dr. Nissan requested plaintiff be evaluated by the psychology department to assess the mental factors that could be contributing to her headache pain.  These factors included personality, mood, lifestyle, coping styles, and the possible presence of comorbid disorders.

At her next psychiatric appointment with Dr. Rohatgi at Comtrea on August 4, 2011, plaintiff stated that her headaches had diminished and going to the Diamond Headache Clinic was of benefit.  (Tr. 408-09, 461-62).  She also stated, however, that she was upset

---

[20] Norflex is an injectable drug indicated as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute painful musculoskeletal conditions.  See Phys. Desk. Ref. 1824 (60th ed. 1824).

[21] Zofran, or Ondansetron, is used to prevent nausea and vomiting caused by cancer chemotherapy, radiation therapy, and surgery.  http://www.nlm.nih.gov/med lineplus/druginfo/meds/a601209.html (last visited Jan. 13, 2015).

[22] Levothyroxine is a thyroid hormone used to treat hypothyroidism. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682461.html (last visited July 1, 2015).

[23] Protonix, the brand name for Pantoprazole, is used to treat GERD. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601246.html (last visited July 1, 2015).

[24] Simvastatin, also known as Zocor, is indicated for the treatment of cholesterol.  See Phys. Desk Ref. 2078 (60th ed. 2006).

[25] Lyrica, or Pregabalin, is an anticonvulsant indicated for the treatment of neuropathic pain and postherpetic neuralgia and for the management of fibromyalgia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605045.html (last visited on Mar. 9, 2011).

[26] Dolophine, the brand name for Methadone, is used to relieve severe pain and prevent withdrawal symptoms in patients who were addicted to opiate drugs. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682134.html (last visited July 1, 2015).

[27] Phenergan, or Promethazine, is used to relieve the symptoms of allergic reactions such as allergic rhinitis (runny nose and watery eyes caused by allergy to pollen, mold or dust), allergic conjunctivitis (red, watery eyes caused by allergies), allergic skin reactions, and allergic reactions to blood or plasma products.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682284.html (last visited on Mar. 11, 2011).

[28] Depo-Medrol, or Methylprednisolone, is a corticosteroid used to relieve inflammation. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601157.html (last visited on Mar. 9, 2011).

the clinic had labeled her as "passive." She requested to restart Triazolam and Remeron,[29] since her sleep had been disturbed. Dr. Rohatgi honored her request and asked her to follow-up in three months. On a return office visit to the Diamond Headache Clinic on August 26, 2011, plaintiff reported that she overall was doing better and felt more alert and awake. (Tr. 386-90, 437-41). Dr. Feoktistov assessed her chronic migraines as improved. While she was still having daily mild headaches and biweekly severe headaches, her severe headaches were better responding to Toradol, Norflex, and Bendadryl. The doctor planned to increase her dosage of Lyrica and instructed her to schedule a follow-up in three months.

On September 20, 2011, disability examiner Tamara Huggins completed a Physical Residual Functional Capacity Assessment for plaintiff. (Tr. 62-68). Huggins found that plaintiff did not have any exertional, postural, manipulative, visual, or communicative limitations. With regard to environmental limitations, Huggins determined that plaintiff should avoid concentrated exposure to extreme heat, humidity, noise, vibration, and hazards. Plaintiff was capable of unlimited exposure to extreme cold, wetness, and fumes, odors, dusts, or gases. In support of her conclusions, Huggins explained that plaintiff had migraines with auras, so she should avoid concentrated exposure to loud noise, vibration, big machinery and heights. Because plaintiff had extrinsic asthma, she should avoid extreme heat and humidity. Upon review of plaintiff's medical records and subjective reports, Huggins considered plaintiff's statements partially credible since they were partially consistent with the medical evidence in her file.

Also on September 20, 2011, James Spence, Ph.D. completed a Mental Residual Functional Capacity Assessment for plaintiff. (Tr. 391-93). Dr. Spence found that plaintiff was moderately limited in her ability to understand and remember detailed instructions, but not significantly limited in her ability to understand and remember very short and simple instructions or to remember locations and work-like procedures. Plaintiff was moderately

---

[29] Remeron, or Mirtazapine, is prescribed for the treatment of depression. http://en.wikipedia.org/wiki/Mirtazapine.

limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods. She was not otherwise significantly limited in her sustained concentration and persistence abilities. Dr. Spence also found no significant limitations in plaintiff's social interaction or adaptation abilities. In considering plaintiff's medical records and subjective reports, Dr. Spence found plaintiff's statements partially credible since they were partially consistent with the medical evidence in her file. To conclude, Dr. Spence found that plaintiff retained the ability to perform simple repetitive tasks on a sustained basis.

Dr. Spence also completed a Psychiatric Review Technique for plaintiff on September 20, 2011. (Tr. 394-404). Dr. Spence found that plaintiff had a depression disorder and claustrophobia. Plaintiff had mild restriction of daily living activities and mild difficulties maintaining social functioning. She had moderate difficulties in maintaining concentration, persistence and pace. Plaintiff had no repeated episodes of decompensation.

At her follow-up appointment with Dr. Rohatgi on October 27, 2011, plaintiff reported that she had not been taking her sleeping medications as prescribed because she thought she was running low on her medications. (Tr. 406-07, 459-60). Because of her sporadic use of the medications, she had been having difficulty sleeping. Plaintiff's exercise habits were "quite poor," and she did not follow the stretching routine provided by the Diamond Headache Clinic. Plaintiff denied experiencing depression or loss of interest. Upon examination, Dr. Rohatgi found that her grooming was appropriate, her dress casual, good eye contact, fluent and clear speech, euthymic affect, and good mood. She was sitting in her chair smiling, comfortable, and not in distress. Dr. Rohatgi planned to decrease her dosage of Triazolam and continue her with Remeron.

During a return visit to the Diamond Headache Clinic, plaintiff reported to Dr. Feoktistov that she had been doing better. (Tr. 424-29, 431-36). Since her last office visit, the frequency of her severe headaches had increased from twice to three times a week; the frequency of her milder headaches had decreased from daily to 3 to 4 times a week.

Plaintiff complained of poor sleep quality, vision loss in one eye, nausea, difficulty concentrating, an inability to speak, and anxiety. Dr. Feoktistov planned to increase plaintiff's Lyrica dosage and reduce the Triazolam. He instructed her to maintain her headache calendar, follow a low tyramine diet, decrease caffeine intake, exercise, lose weight, keep regular sleep habits, keep her blood pressure low, and follow-up in three months.

On January 25, 2012, plaintiff had a follow-up appointment with Dr. Sharda for her headaches. (Tr. 476-77). Her headaches varied from 5-10 on a 10-point intensity scale. Rain, flashing lights, and noisy environments made them worse. She complained of seeing halos and flashing lights in her field of vision. On March 2, 2012, Dr. Feoktistov noted that plaintiff had improved since her last office visit. (Tr. 455-56). She was still having insomnia, however. The doctor increased her Lyrica, discontinued Remeron, and started her on Pamelor[30] at bedtime. On April 5, 2012, plaintiff told Dr. Sharda that she had not noticed any change from taking Pamelor. (Tr. 474-75). She complained of daily headaches with nausea, blurred, double vision, and at times flashes of light. She also stated that when she walked a substantial amount, she experienced low back pain. Dr. Sharda noted that plaintiff had experienced a recent abnormal weight gain. An x-ray of her lumbar spine taken that day showed mild degenerative changes. (Tr. 481).

At a follow-up appointment with her psychiatrist, Dr. Rohatgi, on April 6, 2012, plaintiff denied depression and stated that events in her life brought her joy. (Tr. 457-58). However, the doctor noted that her demeanor and expressions seemed sad. Plaintiff reported that she had been sleeping better with use of Triazolam. Dr. Rohatgi discussed the benefits of taking an antidepressant with plaintiff, but she refused the prescription. As such, the doctor continued her on Triazolam and instructed her to follow-up in four months. At a follow-up appointment with Dr. Sharda on July 2, 2012, plaintiff complained of low back

---

[30] Pamelor, the brand name for Nortriptyline, is a tricyclic antidepressant.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682620.html (last visited July 1, 2015).

pain across her lumbar region and heartburn symptoms at night.  She had been prescribed Tessalon[31] at an urgent care center a few days before and felt better.  Plaintiff still had chronic headaches for which she continued to see a neurologist.

### III.  The ALJ's Decision

In the decision issued on January 22, 2013, the ALJ made the following findings:

1.  Plaintiff met the insured status requirements of the Social Security Act throughout the period of the ALJ's decision.

2.  Plaintiff had not engaged in substantial gainful activity since August 13, 2010, the alleged onset date.

3.  Plaintiff had the following severe impairment:  migraine headache.

4.  Plaintiff's condition did not meet or medically equal a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Since August 13, 2010, plaintiff had had the residual functional capacity (RFC) to perform the full range of light work as defined in 20 C.F.R. 404.1567(a).

6.  Plaintiff was able to perform her past relevant work since August 13, 2010.

7.  Plaintiff was not disabled within the meaning of the Social Security Act.

(Tr. 8-20).

### IV.  Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled."  Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's

---

[31] Tessalon, the brand name for Benzonatate, is a cough suppressant.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682640.html (last visited July 1, 2015).

findings, the Court must affirm the decision of the Commissioner.  <u>Buckner v. Astrue</u>, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A); <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 942 (8th Cir. 2009).  The Commissioner has established a five-step process for determining whether a person is disabled.  <u>See</u> 20 C.F.R. § 404.1520; <u>Moore v. Astrue</u>, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  <u>Pate-Fires</u>, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  <u>Id.</u>

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations."  <u>Moore</u>, 572 F.3d at 523 (<u>citing</u> 20 C.F.R. § 404.1545(a)(1)).  "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations."  <u>Moore</u>, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.    Discussion

Plaintiff argues that the ALJ's RFC finding was improper, because the ALJ failed to include any non-exertional limitations for her migraine headache symptoms, the ALJ's credibility assessment of plaintiff was not supported by substantial evidence, and the ALJ's conclusion that plaintiff could return to past relevant work was not supported by substantial evidence.

### A.    Limitations in the RFC Finding

After considering the objective medical evidence and other evidence in the record, the ALJ determined that plaintiff retained the residual functional capacity to perform the full range of light work, despite her migraine headaches.  (Tr. 14).  The ALJ recognized that the medical record showed that plaintiff experienced migraine symptoms and regularly sought intervention for migraine headaches, but the record did not support a finding that the symptoms were disabling.  Medical images of her brain did not show an abnormality, blood tests revealed normal results, and neurological exams consistently demonstrated normal results.

Plaintiff suggests that the ALJ erred in failing to add any additional limitations to her RFC finding for plaintiff's headache impairment, such as the need for additional breaks, absences from work, or leaving work early.  The Court's review of the record confirms that plaintiff had normal MRI and CT imaging studies of the brain, normal blood tests, and normal neurological examinations.  See Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011) (finding that substantial evidence supported the ALJ's decision when the ALJ found "little evidence in the record" to support plaintiff's claims of "pervasive occurrence of debilitating headaches" when "CT scans and neurological examinations had not revealed 'significant abnormalities or deficits' that could be attributed to the headaches, nor did the

record document any medical findings of 'specific limitations related to migraine headaches'").

Also, the symptoms plaintiff alleged interfered with her ability to complete tasks, concentrate, understand people and follow instructions, including vision loss, impaired speech, incoherence and memory problems, were consistently and expressly contradicted by normal physical examinations in the medical record. On several occasions in the record, such as when Dr. Head recommended a spinal tap, plaintiff refused suggested medical treatment. Treating physicians opined that plaintiff's migraines had a psychological aspect when every physical test and examination conducted was negative or within normal limits and plaintiff admitted to extreme stress but denied mental health issues and refused antidepressant medication. When plaintiff adhered to her doctors' instructions and her prescribed medication regimen, the record shows she experienced improvement from treatment provided and medications prescribed. As such, the work restrictions plaintiff alleges the ALJ failed to include in the RFC finding were not supported by the record as a whole.

### B.      The ALJ's Credibility Assessment of Plaintiff

Plaintiff next argues that the ALJ erred in her credibility assessment of plaintiff in the RFC finding. The ALJ concluded that plaintiff's subjective complaints regarding her condition "lack[ed] credibility." (Tr. 15). In making this determination, the ALJ noted that the medical record reflected that plaintiff had experienced migraine headaches since at least mid-2009, yet she engaged in substantial gainful activity for a year prior to her alleged onset date in spite of this condition. Furthermore, the ALJ noted that there was no objective medical evidence of significant deterioration of her condition in the record. No physician had imposed restrictions on her, let alone opined that she was disabled.

In evaluating the credibility of a plaintiff's testimony and complaints in the absence of an objective medical basis, an ALJ is required to consider (1) the claimant's daily activities, (2) the duration, frequency and intensity of the pain, (3) precipitating and

aggravating factors, (4) dosage, effectiveness and side effects of medication, and (5) functional restrictions. Polaski v. Heckler, 439 F.2d 1320, 1322 (8th Cir. 1984). The ALJ "need not explicitly discuss each Polaski factor," however. Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (citing Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004)). The ALJ "only need acknowledge and consider those factors before discounting a claimant's subjective complaints." Id.

Plaintiff reported to a neurologist, Dr. Head, that she had experienced chronic headaches since her teenage years, and reported to a psychiatrist, Dr. Rohatgi, that she had a history of migraines since childhood. (Tr. 212-13, 420-22). When she first sought evaluation for her headaches worsening, the ALJ correctly noted that the date was June 2009. For more than a year after this initial complaint, during which plaintiff received treatment for her headaches, plaintiff continued gainful activity with the same employer despite her symptoms. The ALJ was entitled to consider this evidence in her credibility assessment and disability determination. See Martise v. Astrue, 641 F.3d 909, 924 (8th Cir. 2011) ("[A] condition that was not disabling during working years and has not worsened cannot be used to prove present disability.") (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)).

The ALJ also correctly noted the absence of evidence of significant deterioration of her condition in the record, since she routinely reported improvement at follow-up appointments in response to medications or treatment advice subsequent to her alleged onset date. Also, treating physicians never placed functional restrictions on plaintiff in the record, and instead instructed her to engage in physical exercises and regular activities. Although medical providers were unable to fully prevent plaintiff's migraines, prescribed medications, such as Ketorolac, helped to decrease the severity of her symptoms. During her week-long stay at the in-patient unit of the Diamond Headache Clinic, Dr. Nissan noted that plaintiff's pain was managed with simple, non-narcotic analgesics. (Tr. 452-54). As such, the effectiveness of medication and treatment in managing plaintiff's migraines

detracted from the credibility of her allegations of disabling pain.  Lastly, the medical record as a whole substantially supports the ALJ's suspicion of the magnitude of plaintiff's assertions regarding her abilities to engage in activities of daily living.  Thus, the ALJ did not err in her credibility assessment for plaintiff.

### C.      Past Relevant Work

Plaintiff also argues that the ALJ's conclusion that plaintiff could return to her past relevant work as a transfer clerk and title researcher is not supported by substantial evidence.  In reaching this conclusion, the ALJ noted that the vocational expert testified that plaintiff's past relevant work experience did not require more than a light exertional capacity if the jobs were performed as customarily performed in the national economy, or if they were performed as she performed them.  (Tr. 15).  A review of the hearing transcript shows that the vocational expert testified that both of her past jobs required only a sedentary capacity as described and performed by plaintiff.  (Tr. 54).  Based on the ALJ's finding that plaintiff retained the residual functional capacity to perform the full range of light work, the ALJ concluded that plaintiff could perform her past relevant work.

Plaintiff contends that the ALJ failed to recognize that her past jobs were both highly skilled based on their designated specific vocational preparation (SVP) skill levels and would require concentrated attention and focus with accompanying stress.  Relying upon the Dictionary of Occupational Titles (DOT), the vocational expert testified that both of plaintiff's past positions were "semi-skilled," even though the jobs were classified at SVP levels of 5 and 6.  The Social Security regulations delineate work experience based skill level and Social Security Ruling 00-4p states that "skilled work corresponds to an SVP of 5-9 in the DOT."  SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000); 20 C.F.R. § 404.1568.  Skill levels of past relevant work are examined in disability determinations to assess the transferability of developed skills to other occupational endeavors.  Id.

However, plaintiff's argument that she would be unable to continue to perform the demands of her highly skilled past relevant work is unsupported by the medical evidence

and other evidence in the record. For more than a year after she first began receiving treatment for her migraines, plaintiff continued to work at her same position. The only evidence to support plaintiff's contention that she had functional limitations in her ability to maintain attention and focus arose from a discounted consulting examiner's opinion. Dr. Spence, a state-agency psychologist who reviewed the record and completed a Psychiatric Review Technique for plaintiff in September 2011, opined that plaintiff was limited to simple, repetitive tasks. (Tr. 394-404). The ALJ provided "little weight" to Dr. Spence's opinion, because she found "nothing in the medical record [to] support[] it." (Tr. 14). Instead, after reviewing the record as a whole, the ALJ determined that plaintiff had no more than mild restrictions in her activities of daily living, maintaining social functioning, or maintaining concentration, persistence and pace.

Substantial evidence in the record, as set forth above, supports the ALJ's finding that plaintiff could return to her past relevant work. The vocational expert's misclassification as to the skill level of her past positions amounted to no more than harmless error. See, e.g., Osborne v. Colvin, No. 8:14-CV-20, 2015 WL 1004311, at *16 (D. Neb. Mar. 6, 2015) ("For judicial review of the denial of Social Security benefits, an error is harmless when the outcome of the case would be unchanged even if the error had not occurred.") (citing Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003)). The record is fully developed and substantially supports the ALJ's finding that plaintiff was not disabled within the meaning of the Social Security Act.

## VI.    Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of September, 2015.